UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

ALFRED TOLLIVER, JR.                          DOCKET NO. 6:09-cv-0135

VERSUS                                        JUDGE MELANÇON

MICHAEL J. ASTRUE,                            MAGISTRATE JUDGE HANNA
COMMISSIONER OF SOCIAL SECURITY


## REPORT AND RECOMMENDATION


Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be REVERSED and

REMANDED for reconsideration in accordance with this report and recommendation.


## BACKGROUND AND THE COMMISSIONER'S FINDINGS

Mr. Tolliver's alleged disability began with an on-the-job injury on October 12,

2003.[1]  On that date, Mr. Tolliver was employed by Pilot Travel Center, a truck stop,

as a maintenance worker.[2]  As he was transferring large, heavy bags of garbage into

---

[1]     Rec. Doc. 8-1 at 154.

[2]     Rec. Doc. 8-1 at 111, 154.

a cart, he lost his footing, fell on his right side and hit his head and neck against the cart, injuring his neck, right arm, and the entire right side of his body.[3]

A few days after the accident, Mr. Tolliver presented at St. Martin Hospital on two separate occasions complaining of shoulder pain.[4]  X-rays taken of his right shoulder were normal, and x-rays of his cervical spine revealed mild degenerative changes.[5]

Approximately one month after the accident, Mr. Tolliver saw Dr. John Cobb of Lafayette Bone & Joint Clinic.[6]  Mr. Tolliver complained of neck and shoulder pain, headaches upon turning his head to the left, tingling in his right hand, and trouble sleeping.  He described his pain level as an 8 on a scale of 1 to 10.  Dr. Cobb's impression was that Mr. Tolliver had sustained a sprain or strain of his cervical spine with cervical radiculitis, possible carpal tunnel syndrome or ulnar nerve injury on the right, and posterior column mediated pain on the right with possible third occipital nerve symptoms.  He recommended physical therapy, a cervical MRI,

---

[3]     Rec. Doc. 8-1 at 154, 159; 8-2 at 3; 8-2 at 29.

[4]     Rec. Doc. 8-1 at 141-145, 146-151.

[5]     Rec. Doc. 8-1 at 149.

[6]     Rec. Doc. 8-2 at 29.

prescribed medrol and lortab, and referred Mr. Tolliver to Dr. Daniel Hodges for nerve conduction studies of his right arm.[7]

Mr. Tolliver treated regularly with Dr. Cobb through October 2004 when Dr. Cobb noted that the workers' compensation insurer had delayed authorization for the recommended procedures. At that point he referred Mr. Tolliver to Dr. Hodges for management of his chronic pain.[8]

Dr. Cobb also referred Mr. Tolliver to McLeod-Trahan-Sheffield Physical Therapy Services, Inc. where he underwent four months of physical therapy.  Upon discharge in May 2004, it was noted that his response to physical therapy was fair, that his goals of reducing neck pain, reducing neck tenderness, being able to drive with less pain, and improving his sleeping ability were partially met, and that his goal of increasing his cervical range of motion to 80% of normal was met.[9]

In March 2004,  Mr. Tolliver saw Dr. G. Gregory Gidman of Acadiana Center for Orthopedic and Occupational Medicine for a "second opinion".[10]  Mr. Tolliver complained of neck pain, right shoulder pain running down the right arm to the long,

---

[7]     Rec. Doc. 8-2 at 29-32.

[8]     Rec. Doc. 8-2 at 35.

[9]     Rec. Doc. 8-2 at 1.

[10]    Rec. Doc. 8-1 at 154-157.

ring, and little fingers, as well as numbness in his right hand and numbness and tingling in the fingers of his right hand.  He described a burning pain in the back of his right thigh, and stated that his symptoms are worsened by movement.[11]   Mr. Tolliver told Dr. Gidman that he had been out of work since the accident.[12]

Dr. Gidman took x-rays of the right shoulder, which were normal, and x-rays of the cervical spine, which showed a spur at C5 and calcification of the anterior longitudinal ligament at C5-C6.  He reviewed Mr. Tolliver's MRI of December 1, 2003, which was normal.   He saw no evidence of arthritic changes, nerve compression, foraminal canal stenosis, disc herniation, or degenerative changes.  He diagnosed a cervical contusion.[13]  Dr. Gidman recommended that Mr. Tolliver take nonsteroidal anti-inflammatory medication along with mild painkillers.  He also opined that Mr. Tolliver should increase his activity level but avoid heavy lifting and both repetitive head motions and holding his head in a fixed position for a length of time.  Dr. Gidman opined that Mr. Tolliver could return to light duty work.[14]

---

[11]        Rec. Doc. 8-1 at 154.

[12]        Rec. Doc. 8-1 at 155.

[13]        Rec. Doc. 8-1 at 156.

[14]        Rec. Doc. 8-1 at 156.

In September 2004, an independent  medical examination was performed by Dr. Stanley Foster of Orthopedic & Sports Medicine Associates of Acadiana at the request of the Workers' Compensation Administration.[15]  Mr. Tolliver complained to Dr. Foster of a constant burning in his neck that gives him headaches as well as pain that travelled down his right arm, causing right arm weakness.  He stated that he had numbness and dropped things.   At that time, Mr. Tolliver was not taking any medications.

Dr. Foster claims to have examined two MRIs – one of Mr. Tolliver's cervical spine and the other of his lumbar spine – but the dates are troubling.  Dr. Foster's report states that the MRIs were taken in February 200*2*,[16] prior to Mr. Tolliver's injury in October 2003.  There is no other reference in the record to these MRIs.  It is not clear if these were Mr. Tolliver's MRIs or if Dr. Foster incorrectly set out the dates of the MRIs that he reviewed.  Dr. Foster also reviewed the report from the December 2003 MRI of the cervical spine, which showed mild bulging at C5-6 but was described by Dr. Foster as a normal MRI.[17]

---

[15]     Rec. Doc. 8-2 at 3-5.

[16]     Rec. Doc. 8-2 at 4.

[17]     Rec. Doc. 8-2 at 4.

Like Dr. Gidman, Dr. Foster recommended that Mr. Tolliver be prescribed nonsteroidal anti-inflammatory medications and be encouraged to increase his activity level.  Dr. Foster opined that Mr. Tolliver could perform sedentary to light duty work.[18]

Between November 2004 and May 2005, Mr. Tolliver treated with Dr. Daniel L. Hodges of Lafayette Bone & Joint Clinic, on the recommendation of Dr. Cobb, for pain management.[19]  Dr. Cobb had previously recommended facet injections at C1-2 and C2-3 as well as left and right carpal tunnel release surgeries, but Mr. Tolliver's workers' compensation insurer had denied authority for those procedures.  Mr. Tolliver's chief complaints to Dr. Hodges were of neck and right shoulder pain.  Mr. Tolliver described burning, tingling pain in the neck with pain radiating into his shoulders and down to his fingers.  He stated that lifting his arm and reaching overhead aggravated the pain while resting and sitting down helped the pain.  He described weakness on his right side and sleep deprivation.

An EMG/NCV study of the right upper extremity performed on January 6, 2004 revealed right median nerve entrapment neuropathy at the level of he carpal

---

[18]     Rec. Doc. 8-2 at 5.

[19]     The first of Dr. Hodges's records is found at Rec. Doc. 8-2 at 7.

tunnel.[20]  It was Dr. Hodges's initial impression that Mr. Tolliver had escalating neck and arm pain as well as right carpal tunnel syndrome.[21]

In March 2005, Dr. Hodges noted a limited range of motion of Mr. Tolliver's cervical spine as well as a restricted range of motion in his low back and a positive Tinel's sign over both the left and right wrists.[22]

An EMG/NCV study conducted on April 26, 2005 showed right median nerve entrapment neuropathy at the level of the carpal tunnel, essentially unchanged from the January 2004 study.[23]

In April 2005, Dr. Hodges noted that Mr. Tolliver was now also complaining of bowel and bladder dysfunction.[24]  An updated MRI from March 14, 2005 was "basically normal" with no significant changes at the C4-5, 5-6 or 6-7 levels.[25]

In March and April 2005, Dr. Hodges issued "Work Status Reports," stating that Mr. Tolliver was unable to work pending treatment.[26]

---

[20]     Rec. Doc. 8-2 at 9.

[21]     Rec. Doc. 8-2 at 9.

[22]     Rec. Doc. 8-2 at 11.

[23]     Rec. Doc. 8-2 at 18.

[24]     Rec. Doc. 8-2 at 13.

[25]     Rec. Doc. 8-2 at 14.

[26]     Rec. Doc. 8-2 at 42-43.

In May 2005, Dr. Hodges noted that Mr. Tolliver would need carpal tunnel release surgery in the future.[27]

In April 2006, Mr. Tolliver was seen at the behest of the worker's compensation insurer by Dr. Stephen M. Wilson of the Bone and Joint Clinic of Baton Rouge, Inc.[28]  Dr. Wilson stated that his examination of Mr. Tolliver's neck and back did not show swelling, inflammation, or muscle spasm, although Mr. Tolliver complained of pain on rotation of his neck to the left or right, pain with heel and toe walking, pain with forward flexion, and pain with minimal palpation of the lumbrosacral region.  Dr. Wilson opined that Mr. Tolliver was exaggerating his symptoms and that, with motivation, he could return to work so long as he lifted less than 20 lbs. regularly, less than 50 lbs. occasionally, and did only occasional bending, stooping, crawling, or climbing.

In September 2006, Mr. Tolliver began to treat with Dr. Matthew Mitchell of Louisiana Pain Management.  At the initial visit, Dr. Mitchell's impressions were that Mr. Tolliver was suffering with occipital neuralgia, cervical enthesopathy (disorder of the muscular or tendinous attachment to bone), symptoms consistent with ulnar compression, median nerve compression on the right, cervical radiculitis, and lumbar

---

[27]     Rec. Doc. 8-2 at 15

[28]     Rec. Doc. 8-2 at 20-22.

radiculitis.[29]   In his opinion, Mr. Tolliver was unable to return to work pending treatment.[30]

In October 2006, Dr. Mitchell noted that digital motion x-rays of October 12, 2006 showed laxity or tear of the posterior longitudinal ligament at C5-6 and laxity and tear at C3-4.[31]  He said:  "This could certainly account for the symptoms he is experiencing."[32]

In November 2006, Dr. Mitchell performed nerve block injections at C3, C4, C5, and C6, which temporarily resulted in 100% relief of Mr. Tolliver's pain.[33]  In December 2006, he performed a radiofrequency procedure[34] and a lumbar steroid injection at L5-S1[35] that were designed to provide pain relief.  Dr. Mitchell explained that, depending on the results of the first radiofrequency procedure, Mr. Tolliver might need to have the radiofrequency procedure repeated every six to twelve

---

[29]      Rec. Doc. 8-2 at 80-82.

[30]      Rec. Doc. 8-2 at 78.

[31]      Rec. Doc. 8-2 at 73.

[32]      Rec. Doc. 8-2 at 73.

[33]      Rec. Doc. 8-2 at 70.

[34]      Radiofrequency thermocoagulation of the medial branch nerve at C3, C4, C5, and C6. Rec. Doc. 8-2 at 64.

[35]      Rec. Doc. 8-2 at 64.

months.[36]   The record does not indicate whether any further procedures were performed.

In March 2007, Dr. Mitchell referred Mr. Tolliver back to Dr. Cobb.[37]  Mr. Tolliver continued to complain of numbness in his right hand and arm and Dr. Cobb again evaluated him for carpal tunnel syndrome.[38]  Dr. Cobb recommended carpal tunnel release surgery on the right.[39]  Dr. Cobb stated that Mr. Tolliver was unable to work pending treatment.[40]

Dr. Cobb performed the carpal tunnel release surgery (release of the volar carpal ligament) on Mr. Tolliver's right arm on September 27, 2007.[41]  At the hearing, however, Mr. Tolliver testified that the surgery was not a total success because he continues to experience right arm pain especially when using his cane.[42]

---

[36]     Rec. Doc. 8-2 at 67.

[37]     Rec. Doc. 8-2 at 36.

[38]     Rec. Doc. 8-2 at 36-38.

[39]     Rec. Doc. 8-2 at 38.

[40]     Rec. Doc. 8-2 at 38.

[41]     Rec. Doc. 8-2 at 110.

[42]     Rec. Doc. 8-1 at 37-38.

On March 12, 2008, Mr. Tolliver was scheduled for a functional capacity evaluation at Advanced Therapy Specialists.[43]   Before the test began, his blood pressure was 130 over 90.  Once the testing started, his blood pressure rose to 180 over 140.  The testing was discontinued and could not be completed because of the elevated blood pressure reading.

Mr. Tolliver continued to treat with Dr. Mitchell.  In November 2007, Dr. Mitchell issued a "Work Status Report," in which he stated that Mr. Tolliver was unable to return to work pending treatment.[44]   On April 22, 2008, Dr. Mitchell wrote a letter to Mr. Tolliver's then attorney, explaining:  "I realize at one point, Dr. Hodges felt the patient could return to light duty.  I feel that since then, his condition has deteriorated significantly.  He appears to have had worsening of his condition significantly.  When I saw him last time, he was having difficulty doing even his activities of daily living."[45]   Dr. Mitchell listed eleven diagnoses for Mr. Tolliver, including cervical degenerative disc disease, cervical radiculitis, occipital neuralgia, right ulnar compression symptoms, right carpal tunnel syndrome (status post carpal tunnel release), left carpal tunnel syndrome (awaiting evaluation for surgery), lumbar

---

[43]      Rec. Doc. 8-2 at 128.

[44]      Rec. Doc. 8-2 at 119.

[45]      Rec. Doc. 8-2 at 112.

-11-

radiculitis, unstable neck as documented on DMX[46] of October 12, 2006, cervical facet disease, and cervical spondylosis without myelopathy.  He concluded that Mr. Tolliver "would be a poor candidate to return to work.  I am making him permanently and totally disabled from this point forward."[47]

Mr. Tolliver filed an application for a period of disability and disability insurance benefits and a separate application for supplemental security income in April 2007.  Both claims were denied.  Mr. Tolliver requested a hearing, which was held on September 11, 2008.[48]  Mr. Tolliver was represented by legal counsel at the hearing,[49] and a vocational expert testified at the hearing.[50]  Thereafter, an unfavorable decision was rendered.[51]  The Appeals Council affirmed the decision.[52] This lawsuit was then filed.

---

[46]    Rec. Doc. 8-2 at 112.

[47]    Rec. Doc. 8-2 at 112.

[48]    A copy of the hearing transcript can be found in Rec. Doc. 8-1 at 22-47.

[49]    Rec. Doc. 8-1 at 24.

[50]    Rec. Doc. 8-1 at 24, 42-47.

[51]    Rec. Doc. 8-1 at 10; Rec Doc. 8-1 at 13-21.

[52]    Rec. Doc. 8-1 at 4.

## ASSIGNMENT OF ERRORS

Mr. Tolliver argues that the Commissioner's ruling is flawed in two ways. First, Mr. Tolliver argues that the ALJ erred in finding that his complaints of pain and disability were not supported by objective medical evidence in the record or by his physicians' opinions. Second, Mr. Tolliver argues that the ALJ erred in ignoring the limitations placed on him by his physician and finding that there are significant numbers of job in the national economy that he can perform.

## STANDARD OF REVIEW

Disability is defined in the Social Security regulations as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[53] Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit.[54]

In determining whether a claimant is disabled, the Commissioner uses a five-step sequential analysis, which requires analysis of the following: (1) whether

---

[53]     42 U.S.C. § 423(d)(1)(A).

[54]     20 C.F.R. § 404.1572(a)-(b).

-13-

the claimant is currently engaged in substantial gainful activity (i.e., whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (i.e., whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.[55]

The claimant bears the burden of proof on the first four steps, and then the burden shifts to the Commissioner on the fifth step to show that the claimant can perform other substantial work in the national economy.[56]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[57]

If the Commissioner determines that the claimant is disabled at any step, the analysis ends.[58]  If the Commissioner cannot make a determination at any step, he

---

[55]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).  See, also, 20 C.F.R. § 404.1520.

[56]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[57]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[58]     20 C.F.R. § 404.1520(a)(4).

goes on to the next step.[59]   Before going from Step Three to Step Four, the Commissioner assesses the claimant's residual functional capacity.[60]   The claimant's residual functional capacity assessment is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record.[61]   The claimant's residual functional capacity is used at the fourth step to determine if the claimant can still do his past relevant work, and at the fifth step, it is used to determine whether the claimant can adjust to any other type of work.[62]

This court's review of the Commissioner's decision that the claimant is not disabled is limited to determining whether that decision was supported by substantial evidence and whether the proper legal standards were applied in reaching that decision.[63]   If the Commissioner's findings are supported by substantial evidence, they must be affirmed.[64]   Substantial evidence is such relevant evidence as a

---

[59]     20 C.F.R. § 404.1520(a)(4).

[60]     20 C.F.R. § 404.1520(a)(4).

[61]     20 C.F.R. § 404.1545(a)(1).

[62]     20 C.F.R. § 404.1520(e).

[63]     *Alfred v. Barnhart*, 181 Fed. App'x 447, 449 (5th Cir. 2006); *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001);

[64]     *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

responsible mind might accept to support a conclusion; it is more than a mere scintilla and less than a preponderance.[65]  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.[66] Finding substantial evidence does not involve a search of the record for isolated bits of evidence that support the Commissioner's decision; instead, the entire record must be scrutinized as a whole.[67]  In applying this standard, the court may not re-weigh the evidence or substitute its judgment for that of the Commissioner.[68]

**DISCUSSION**

After analyzing the entirety of the record, the undersigned finds that the ALJ's decision that Mr. Tolliver is not disabled is not supported by substantial evidence.

## I.   THE ALJ FAILED TO PROPERLY ANALYZE STEP THREE OF THE DISABILITY ANALYSIS

---

[65]     *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[66]     *Boyd v. Apfel,* 239 F.3d at 704.

[67]     *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

[68]     *Boyd v. Apfel,* 239 F.3d at 704; *Carey v. Apfel*, 230 F.3d at 135.

At Step One of the disability analysis, the ALJ determined that Mr. Tolliver has not engaged in substantial gainful activity since June 20, 2006.[69]  This conclusion is consistent with Mr. Tolliver's testimony at the hearing and the materials included in the record.[70]

At Step Two, the ALJ found that Mr. Tolliver has the following severe impairments:  degenerative disc disease of the cervical spine, hypertension, and carpal tunnel syndrome requiring surgery on his right arm.[71]  This is also consistent with Mr. Tolliver's hearing testimony and the medical records submitted for review.

At Step Three of the analysis, the ALJ was charged with determining whether Mr. Tolliver has an impairment or a combination of impairments that meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  At this step of the analysis, however, the ALJ failed to perform the required analysis.  Instead, he adopted an earlier state agency evaluation, stating that "the state agency medical consultants who evaluated the claimant's condition at the initial determinations determined the claimant has no condition which meets or equals

---

[69]     Rec. Doc. 8-1 at 15

[70]     Rec. Doc. 8-1 at 76, 155.

[71]     Rec. Doc. 8-1 at 15.

-17-

the requirements of a listed impairment."[72]   All the agency determination said regarding this step of the analysis was:  "We have determined that your condition is not severe enough to keep you from working."[73]   There was no analysis concerning the basis for that conclusion by the state agency.

Reaching this conclusion in this manner at this step in the analysis is error. Although the ALJ is not required "to do an exhaustive point-by-point discussion" of the evidence offered in support of a claimant's disability claim,[74] the ALJ is required to identify the listed impairment for which the claimant's symptoms fail to qualify, discuss the evidence, and explain how he reached the conclusion that the claimant's symptoms are insufficiently severe to meet any listed impairment.[75]  When an ALJ fails to do so, a reviewing court cannot tell whether the ALJ's decision was or was not based on substantial evidence.[76]

In this case, the ALJ's decision includes no analysis at Step Three.  In relying upon the earlier decision of the state agency, the ALJ adopted a conclusory statement with no analytical or evidentiary underpinnings.  Therefore, the undersigned  cannot

---

[72]     Rec. Doc. 8-1 at 16.

[73]     Rec. Doc. 8-1 at 50.

[74]     *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).

[75]     *Audler v. Astrue*, 501 F.3d at 448.

[76]     *Audler v. Astrue*, 501 F.3d at 448.

tell whether the ALJ's determination that Mr. Tolliver's impairments do not individually or collectively satisfy a listing is based on substantial evidence.

An ALJ's failure to detail his findings at Step Three does not require reversal if the ALJ makes factually supported findings at Step Four and Step Five that eliminate any concern that the claimant might have been adjudged disabled at Step Three.[77]  Fifth Circuit jurisprudence does not require remand in such a situation unless substantial rights have been affected.[78]  However, the ALJ's failure to explain the basis for his decision at Step Three affects substantial rights when the claimant appears to have met his burden to demonstrate that he meets or equals a listing.[79]

In this case, Mr. Tolliver appears to have demonstrated that his impairments meet or equal a listing and the ALJ's conclusions at Steps Four and Five do not appear to be based on substantial evidence.  Therefore, remand is necessary.

Mr. Tolliver sought a finding of disability based on high blood pressure, neck, right arm, shoulder, and right leg impairments, as well as carpal tunnel syndrome.[80] He presented his own subjective description of the severe pain he claims to suffer,

---

[77]     *Reynolds v.* Astrue, 2010 WL 583918, 6 (N.D. Miss. 2010), citing *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).

[78]     *Audler v. Astrue*, 501 F.3d at 448; *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

[79]     *Audler v. Astrue*, 501 F.3d at 449.

[80]     Rec. Doc. 8-1 at 100.

together with records from the treating physicians he consulted since the October 2003 accident, including Dr. Cobb who performed a carpal tunnel surgery and has suggested that a second surgery should be performed, as well as two pain management physicians, Dr. Hodges and Dr. Mitchell.  Dr. Mitchell performed tests showing that Mr. Tolliver has laxity or tearing of the posterior longitudinal ligament at C5-6 and laxity and tearing of that ligament at C3-4, providing an objective basis for the pain that Mr. Tolliver has described.[81]  In 2006, Dr. Mitchell stated that this condition makes Mr. Tolliver's neck unstable and precluded his return to the work force pending treatment.[82]  More recently, however, Dr. Mitchell has opined that Mr. Tolliver's impairments have worsened, making him a poor candidate for returning to the work force at any time.[83]  In his decision, the ALJ did not mention Dr. Mitchell's diagnostic testing or his conclusion that the testing revealed an objective physical explanation for Mr. Tolliver's pain complaints.

Additionally, a functional capacity evaluation had to be stopped because Mr. Tolliver's blood pressure reached an extremely high level.[84]  Although the ALJ's

---

[81]     Rec. Doc. 8-2 at 73.

[82]     Rec. Doc. 8-2 at 73; Rec. Doc. 8-2 at 112.

[83]     Rec. Doc. 8-3 at 1.

[84]     Rec. Doc. 8-2 at 128.

analysis of Mr. Tolliver's impairment mentions the evaluation that had to be stopped because of Mr. Tolliver's dangerously high blood pressure, the ALJ discounted this by concluding that Mr. Tolliver does not always take his blood pressure medication. However, Mr. Tolliver explained at the hearing that the blood pressure medication makes him drowsy, so he does not take it when he has to drive in the city.[85]  This is consistent with Mr. Tolliver's report to the physical therapist at the testing facility that his blood pressure medication makes him too sleepy to drive.[86]  There is no evidence that Mr. Tolliver fails to take the medication at other times, and Mr. Tolliver also testified that he did take his blood pressure medication on the day of the functional capacity evaluation.[87]  The ALJ's analysis did not take account the severity of Mr. Tolliver's blood pressure problem or the severity of the blood pressure problem when combined with the neck, arm, shoulder, and leg problems.

The ALJ also impermissibly discounted the opinions of Mr. Tolliver's treating physicians.  Ordinarily, an ALJ will assign more weight to the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's

---

[85]     Rec. Doc. 8-1 at 40, 41.

[86]     Rec. Doc. 8-2 at 128.

[87]     Rec. Doc. 8-1 at 40.

injuries, treatments, and responses in determining disability.[88]   But a treating physician's opinions are not conclusive, and such opinions may be assigned little or no weight when good cause is shown.[89]   Good cause permits an ALJ to discount the weight of a treating physician relative to other experts when the treating physician's evidence is conclusory, when it is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or when it is otherwise unsupported by the evidence.[90]   Here, however, both Dr. Cobb's and Dr. Mitchell's opinions are supported by clinical studies, particularly including nerve conduction tests and digital motion x-rays.  Therefore, this is not a situation in which it was appropriate to give no weight at all to the opinions of the treating physicians.

In particular, the record contains no evidence refuting Dr. Mitchell's conclusions based on the DMX study.  In those cases when the ALJ rejects the opinion of the treating physician, and there is no reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, the ALJ may reject the opinion of the treating physician only if he performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. §

---

[88]   *Perez v. Barnhart*, 415 F.3d at 465-66.

[89]   *Newton v. Apfel*, 209 F.3d at 455-56.

[90]   *Newton v. Apfel*, 209 F.3d at 455-56.

404.1527(d)(2).[91]  Under that analysis, the ALJ must evaluate:  the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supporting evidence presented by the treating physician, the consistency of the physician's opinion and the record, the physician's specialization, and any other relevant factors.[92]  In this case, the ALJ did not perform that analysis.  Therefore, he has not demonstrated that there is good cause to discount the weight of the treating physician's conclusions and opinions.

Not only did the ALJ give no weight to Dr. Cobb's and Dr. Mitchell's opinions that Mr. Tolliver is disabled, the ALJ did not mention Dr. Mitchell's diagnostic studies or the objective explanation those studies provided for Mr. Tolliver's pain complaints.  The ALJ discounted not only the treating physicians' opinion on disability but apparently gave no weight to any of Dr. Mitchell's conclusions.  The undersigned finds that this was error.

Still, the ALJ found Mr. Tolliver to be lacking in credibility because he claimed to be suffering with severe pain without sufficient empirical proof of the pain's cause.  The record contains such empirical proof but the ALJ ignored Dr. Mitchell's conclusion that the DMX showed ligament laxity and/or tears at C3-4 and C5-6 that

---

[91]     *Newton v. Apfel*, 209 F.3d at 453.

[92]     20 C.F.R. § 404.1527(d)(2)-(6).

explain the pain.  The Fifth Circuit has held that "[t]he ALJ 'must consider subjective evidence of pain as testified to by the claimant; failure to give consideration to the subjective evidence of pain and disability as testified to by the plaintiff is reversible error."[93]  Again, however,  Mr. Tolliver's treating physician found an objective basis for Mr. Tolliver's pain which was appaently ignored.  This was error.

The ALJ also found Mr. Tolliver to be lacking in credibility because "the claimant seeks very little, if any, medical treatment for his allegedly disabling impairments," noting that three years went by between visits with Dr. Cobb, and stating that "if claimant's impairments were as severe and disabling as alleged, he would have sought regular medical treatment from an orthopedist."[94]  This conclusion is not supported by the record.

The record reveals that Dr. Cobb stopped treating Mr. Tolliver because the workers' compensation carrier would not approve the procedures that Dr. Cobb recommended.[95]  Dr. Cobb referred Mr. Tolliver to Dr. Hodges for pain management, and Mr. Tolliver treated with Dr. Hodges from 2004 to 2005.  Thereafter, Mr. Tolliver treated with another pain management physician, Dr. Mitchell, from 2006 to

---

[93]     *Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th 1981).

[94]     Rec. Doc. 8-1 at 18.

[95]     Rec. Doc. 8-2 at 35.

2008, and Dr. Mitchell referred Mr. Tolliver back to Dr. Cobb for evaluation of the carpal tunnel complaints.[96]  At the time of the hearing, Mr. Tolliver was seeing Dr. Mitchell every three months.[97]  The records do not establish a three-year gap in treatment.  In fact, there is no significant period of time after the accident when Mr. Tolliver was not seeking a physician's treatment with regard to his injuries.

Therefore, the ALJ's conclusions concerning Mr. Tolliver's credibility are not supported by substantial evidence.

For these reasons, the undersigned finds that ALJ's failure to explain the basis for his decision at Step Three makes it impossible to determine whether that decision was or was not based on substantial evidence.  The undersigned further finds that the ALJ's analysis at Steps Four and Five were not based on substantial evidence and consequently affected Mr. Tolliver's substantial rights.  For these reasons, the undersigned recommends that this matter be remanded.

## II.   THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY EVALUATION IS ERRONEOUS

---

[96]      Rec. Doc. 8-2 at 36.

[97]      Rec. Doc. 8-1 at 33.

At Step Four of the disability analysis, the ALJ determined that Mr. Tolliver lacks the residual functional capacity to return to his past relevant work.[98]   This finding is consistent with the record.   At Step Five, the ALJ determined that Mr. Tolliver would be capable of performing jobs that exist in significant numbers in the national economy, such as machine operator.[99]   Based on this conclusion, the ALJ determined that Mr. Tolliver is not disabled.   Mr. Tolliver contends, however, that this conclusion was not supported by the testimony of the vocational expert who appeared at the hearing.

The ALJ proposed a hypothetical question to the vocational expert, and the vocational expert responded that a wide range of light work, fitting the criteria set forth in the hypothetical question, is available, including grinding and polishing machine operation, mixing and blending machine operation, cutting and slicing machine operation, and wood working machine operation.[100]

A second hypothetical question was then posed.   Mr. Tolliver testified that he sometimes uses a cane to facilitate his walking, and the use of the cane sometimes

---

[98]      Rec. Doc. 8-1 at 19.

[99]      Rec. Doc. 8-1 at 19.

[100]     Rec. Doc. 8-1 at 44.

-26-

causes pain in his right hand and arm.[101]  The ALJ then asked the vocational expert to add these facts to the hypothetical equation.  He asked the vocational expert to consider that the claimant uses a cane to assist him in walking, which affects his ability to use his right side, and that on three or four days per month he likely would not be able to complete his work because of pain or other limitations.  Under that situation, it was the vocational expert's opinion that Mr. Tolliver would not be able to maintain employment.[102]

This second response from the vocational expert was disregarded by the ALJ in reaching his conclusion that Mr. Tolliver is capable of returning to light duty work. Therefore, the ALJ disregarded the fact that Mr. Tolliver uses a cane to facilitate his walking and the cane sometimes causes him problems with his right hand and arm. The undersigned finds that these facts should have been considered by the ALJ at Step Five and recommends that this matter be remanded for reconsideration of both hypothetical questions presented to the vocational expert at the hearing in light of all relevant facts applicable to Mr. Tolliver.

## CONCLUSION AND RECOMMENDATION

---

[101]    Rec. Doc. 8-1 at 37.

[102]    Rec. Doc. 8-1 at 45.

Courts have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing.[103]  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.[104]  The record in this matter does not lend itself to such disposition.  Whether Mr. Tolliver's impairments, singly or in combination, meet or equal a listed impairment remains undetermined, as does his residual functional capacity. Consequently, the undersigned RECOMMENDS that this matter be REVERSED and REMANDED for reconsideration in accordance with this report and recommendation.

For the reasons explained above, the undersigned RECOMMENDS that this matter be REVERSED and REMANDED for reconsideration in accordance with this report and recommendation.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

---

[103]    42 U.S.C. § 405(g).

[104]    See, e.g., *Ross v. Astrue*, 2010 WL 2730920, 8 (W.D. La. 2010), citing *Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); and *Rini v. Harris*, 615 F.2d 625, 627 (5th Cir. 1980).

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plan error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 29th day of July, 2010.


Patrick J. Hanna
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)